FILED
IN CLERKS OFFICE

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

2005 NOV 23  P 2: 17

DOCKET NO.: 05-11130-NMG

U.S. DISTRICT COURT
DISTRICT OF MASS.

## D. LYLE ELKINS AND MARTHA ELKINS
Plaintiff

v.

## INTERNATIONAL BROTHERHOOD OF
## TEAMSTERS, LOCAL 264, CATHERINE CREIGHTON
## AND SHUTTLE AMERICA
Defendants

## OPPOSITION OF PLAINTIFFS TO MOTION TO DISMISS OF DEFENDANT
## TEAMSTERS LOCAL 264

Plaintiffs D. Lyle Elkins and Martha Elkins, though counsel, hereby oppose the Motion

of International Brotherhood of Teamsters Local 264 ("Local 264") to Dismiss the Complaint in

this action.

This is an action in which a former employee of Shuttle America (an airline) has sued his

union (Local 264) and its agent (Ms. Creighton) for breach of the union's duty of fair

representation. The employer, Shuttle America, is named both as a necessary party and so that

other claims may be asserted against it. Plaintiff's wife has asserted a claim for loss of

consortium.

### SUMMARY OF AGRUMENT

1.      Under the Massachusetts "Long-Arm" Statute, M.G.L. c.223A, §3, Local 264

regularly transacted business in Massachusetts, and caused tortious injury in Massachusetts.

Local 264 had the requisite minimum contacts with Massachusetts for jurisdiction to be asserted

over it. Among other things, Local 264 accepted monies from Plaintiff Lyle Elkins which were

1

the "agency fee" he paid to them on various occasions, Local 264 had a variety of communications with Mr. Elkins in Massachusetts by telephone and telecopier, and, directly contrary to the Affidavit submitted by Local 264, for many years Local 264 has had at least one other union member who resides in Massachusetts.[1]

2.     The allegations of the Complainant are more than adequate to support a claim of breach of the duty of fair representation owed by Local 264 to Mr. Elkins. Mr. Elkins has alleged in the Complaint that the actions of Local 264's representative Ms. Creighton (who is an attorney) were grounded in a number of conflicts of interest and ethical violations. Specifically, Mr. Elkins had filed complaints with the Bar of the State of New York against Ms. Creighton's law partner, Mr. Giroux. Based upon those filings, Ms. Creighton should have withdrawn from acting as Mr. Elkins' attorney/representative and it can be inferred that Ms. Creighton had bad will toward Mr. Elkins and thus was in a conflict of interest situation in representing him. Furthermore, one of the defenses to his termination which Mr. Elkins wanted raised was his medical inability to attend the flight training (which he was fired for not attending). Advancing that defense would have required Ms. Creighton to call her law partner Mr. Giroux as a witness or to disqualify herself and her firm from representing Local 264 in the case. Ms. Creighton did not advance this defense at the arbitration and did not call Mr. Giroux as a witness. It can be inferred that the reason she did neither of these things was to avoid having to withdraw from the case (if her partner were to be a witness in the case) and thus to ensure that her firm was paid for the work it had done. Finally, during an off the record conversation with the arbitrator hearing

_____

[1] In the Affidavit of Ron Lucas submitted with Local 264's Motion to Dismiss, it is stated that Local 264 has no members in the Commonwealth of Massachusetts. Accompanying this Opposition is the Affidavit of Brian O'Donnell, in which he testifies that for many years he has been a member of Local 264 and for all of those years has resided in Massachusetts. Mr. O'Donnell states that Local 264 has had as many as 25 Shuttle America employee members in Massachusetts. Based upon the differences between the Lucas Affidavit and the O'Donnell Affidavit, all of the other factual allegations advanced by Local 264 are suspect as well.

2

Mr. Elkins' case (to which Mr. Elkins was not privy) Ms. Creighton apparently agreed to pressure Mr. Elkins not to pursue his "medical necessity" defense. Once again, this allowed her to decline to either withdraw from the case or to call her partner as a witness.

In short, Mr. Elkins has alleged that the various negligent actions and poor strategic choices engaged in by Ms. Creighton at his hearing were not due merely to negligence or strategy choices, but rather were due to either bad will toward Mr. Elkins or Ms. Creighton's own self interest. As such, Mr. Elkins has adequately alleged that the actions Ms. Creighton took on behalf of Local 264 were indeed perfunctory and in bad faith and thus a violation of the duty of fair representation owed to him.

3.    Mr. Elkins' state law claims against Local 264 are not preempted by federal law.

4.    Due to the special circumstances of this case, Mr. Elkins' claims for intentional infliction of emotional distress do indeed meet the "outrageousness" standard.

## RELEVANT LAW

Plaintiffs' do not disagree with Local 264 as to the law to be applied in determining the Motion to Dismiss.

As is set forth in cases such as this Court's decision in Bennett v. Jack Dennis Whitewater Trips. 925 F.Supp. 889 (D.Mass. 1996), and the decision in Workgroup Technology Corporation v. MGM Grand Hotel, 246 F.Supp. 2d 102 (D.Mass. 2003) the Court must initially decide whether or not it has personal jurisdiction over Local 264 and then determine if it is constitutional to exercise that jurisdiction. As this Court stated in Bennett at 893, the Court must "find sufficient contacts between the Defendant and the forum state to satisfy both that state's Long-Arm Statute and the Fourteenth Amendment Due Process Clause."

3

The Court must initially determine if personal jurisdiction may be exercised over Defendant pursuant to the Massachusetts Long-Arm Statute, M.G.L. c.223A §3. If the Court is satisfied that such jurisdiction is met, the Court must then determine if the exercise of that jurisdiction over Defendant would be constitutionally permissible.

As to the Massachusetts Long-Arm Statute, the relevant clauses are M.G.L. c.223A §3(a) and §3(d).

Pursuant to M.G.L. c.223A §3(a), a Court may exercise personal jurisdiction over a person, who acts directly or by an agent, as to a cause of action in law or equity arising from the person's "transacting any business in this Commonwealth."

As to M.G.L. c.223A §3(d), a Court may exercise personal jurisdiction over a person, who acts directly or by an agent, as to a cause of action in law or equity arising from the person's "causing tortious injury in this Commonwealth by an act or omission outside this Commonwealth if he regularly does or solicits business, or engages in any persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in this Commonwealth."

As this Court stated in Bennett at 893-894, in order for jurisdiction to exist pursuant to §3(a) two requirements must be met, namely: (1) the Defendant must have transacted business in Massachusetts, and (2) the Plaintiff's claim must have arisen from the Defendant's transaction of such business. The Court also noted at 894 that the "transacting any business" clause in §3 has been construed broadly by Massachusetts Courts. Although an isolated and minor transaction with a Massachusetts resident may be insufficient, "generally the purposeful and successful solicitation of business from residents of the Commonwealth, by a Defendant or its agent, will suffice to satisfy this requirement." With respect to the second requirement of the Long-Arm

4

Statute, that the cause of action "arise from" the transaction of business in Massachusetts, a "but for" test has been adopted. Bennett, supra at 894. In other words, the question to be answered is whether "but for" some in-forum actions by the Defendant, the Plaintiffs' would not have been injured.

As to M.G.L. c. 223A §3(d) the question is whether a tortious injury was committed in Massachusetts by an act or omission outside the Commonwealth, and whether Defendant either regularly does or solicits business in the Commonwealth, or engages in another persistent course of conduct in the Commonwealth. It should be noted that if an out of state tort has caused "shame, embarrassment, or loss of consortium in the forum state" the tort will be deemed to have caused injury in Massachusetts. See, e.g. Darcy v. Hankle, 54 Mass.App.Ct. 846, 768 N.E.2d 583, 587 (Mass.App.Ct. 2002); Noonan v. The Winston Company, 135 F.3d 85, 92 (1st Cir. 1998).

If it is determined that the Long-Arm Statute would allow the Court to exercise jurisdiction over Defendants, the Court must then determine whether the exercise of such jurisdiction "comports with the constraints imposed by the United States Constitution." Workgroup, supra at 108. In making this determination, the Court must decide whether it can exercise "general jurisdiction" or "specific jurisdiction" over the Defendant. According to the Court in Workgroup, supra at 108, note 3, "general jurisdiction" may be exercised when the litigation is not directly founded on the Defendant's forum based contacts but the Defendant has nevertheless engaged in a continuous and systematic course of activity in the forum state. "Specific jurisdiction" arises when the cause of action derives directly out of, or relates to, the contacts the Defendant has with the forum. The exercise of jurisdiction must be deemed

consistent with "traditional notions of fair play and substantial justice." The Defendant must have "minimum contacts" with the forum.

As this Court stated in Bennett at 895, in order to determine if specific jurisdiction exists, a three-prong analysis is used. That analysis is as follows:

> "First, the claim underlying the litigation must directly arise out of, or relate to, the Defendant's forum state activities. Second, the Defendant's in state contact must represent the purposeful availment of the privilege of conducting activities in the forum state, thereby invoking the benefits and protections of that state's laws and making the Defendant's involuntary presence before the state's courts foreseeable. Third, the exercise of jurisdiction must, in light of the Gestalt factors, be reasonable."

Regarding the Union's duty of fair representation, Plaintiffs do not disagree with the standards set forth by Defendant. It is true that a Union is granted great discretion in exercising its obligation to represent an individual in a grievance or arbitration. Similarly, mere negligence in processing a grievance does not constitute a breach of the duty of fair representation. However, when the Union acts in a manner which is "arbitrary, discriminatory, or in bad faith," it has indeed violated the duty of fair representation. See, e.g. Plumey v. Southern Container, 303 F.3d 364 (1stCir. 2002); Vaca v. Sipes, 386 U.S. 171 (1967). If the Union's hostility or animosity toward a grievant affects the handling of the grievance so that the handling of the grievance is itself deficient, the duty of fair representation is breached. See, e.g. MacKnight v. Leonard Morse Hospital, 828 F.2d 48 (1st Cir. 1987).

## FACTUAL BACKGROUND

For their factual basis for opposing the Motion to Dismiss, Plaintiffs' rely upon the well-pleaded allegations of the Complaint, the Affidavit of Plaintiff Lyle Elkins which is appended to this Opposition, and the Affidavit of Brian O'Donnell which is also appended to this Opposition.

6

### 1.    Subject Matter Jurisdiction.

As the Court is aware, Plaintiff Lyle Elkins was a pilot employed by Shuttle America until on or about February, 2003. In February of 2003, Mr. Elkins was fired for refusing to attend a "ground school" which Shuttle America claims was required. Mr. Elkins has asserted that he was unable to attend the ground school due to medical reasons.

At the time of his termination and thereafter, Mr. Elkins was represented by Teamsters Local 264 as his collective bargaining agent and representative. Although Mr. Elkins was not a "member" of Local 264, he paid an "agency fee" to Local 264 on a regular basis and Local 264 was obligated to represent him in the grievance and arbitration process in exactly the same way it was obligated to represent members of the Union. Complaint at par. 12-13.

Mr. Elkins was first fired by Shuttle America in 2001. During the course of his grievance contesting that termination, he was represented by Local 264 through Attorney Joseph Giroux. One of Mr. Giroux' law partners was and is Defendant Creighton. Complaint at par. 15.

During 2002, Mr. Elkins was ordered reinstated to his position with Shuttle America by an arbitrator. The parties to the arbitration disagreed as to the correct manner of carrying out the arbitrator's reinstatement decision. Id.

Mr. Elkins second termination occurred on or about February 3, 2003. The reason given by Shuttle America for firing Mr. Elkins' was that Mr. Elkins did not attend a "ground school" training course which Shuttle America claims he was obligated to attend before being reinstated. Mr. Elkins claims he was medically unable to attend the ground school, that his medical inability to attend was communicated to the Union's representative Attorney Giroux, and that Attorney Giroux communicated these facts to Shuttle America. Complaint at par. 18-22; 29.

7

Case 1:05-cv-11130-NMG   Document 18   Filed 11/23/2005   Page 8 of 20

The arbitration of Mr. Elkins' second termination occurred in June, 2004. In the one and one-half years between Mr. Elkins' termination and the occurrence of the arbitration hearing, Mr. Elkins communicated extensively with Local 264 (although Local 264 did not consistently communicate back with Mr. Elkins). Elkins Affidavit at par. 68-71.

Also during this period, Mr. Elkins felt that he was being inadequately represented by Attorney Giroux on behalf of Local 264. Among other things, Mr. Elkins filed two complaints with the New York State Bar regarding Attorney Giroux' actions on his behalf. Mr. Elkins also requested that the Teamsters appoint a different representative to work with him due to his inability to continue working with Attorney Giroux. Complaint at par. 31-38.

In February 2004, Mr. Elkins was informed that he would indeed have a new representative. The new representative was Defendant Creighton, who was and is a law partner of Attorney Giroux. Complaint at par. 38-39.

In June, 2004, Ms. Creighton represented Mr. Elkins at his arbitration hearing regarding the second termination of employment. Complaint at par. 43-44.

On December, 2004, Mr. Elkins learned that the arbitration had been decided against him and that his termination had been upheld.

Mr. Elkins had started paying an agency fee to Local 264 in approximately the fall of 2001. Elkins Affidavit at ¶66. He paid that for a few months, until his first firing. Id. Once Mr. Elkins was ordered reinstated from his first firing, he paid money to Local 264 to make up for the agency fees that he had not paid while he was fired, and started paying fees again. Id. He even paid agency fees for some time after he was fired for the second time in February, 2003. Id. In relation to all of those payments, Mr. Elkins mailed checks drawn on Massachusetts banks to

Local 264 in New York from his home in Massachusetts. Id. Local 264 negotiated those checks. Id.

Between the Fall of 2001 and October, 2003, Mr. Elkins mailed agency fee checks to Local 264 on at least 10 occasions. Elkins Affidavit at ¶67. The total of the agency fees paid to Local 264 by Mr. Elkins was at least $1,418.50. Id.

Subsequent to Mr. Elkins' termination in February, 2003, he wrote at least several dozen letters to Local 264 regarding different aspects of their representation of him. Elkins Affidavit at ¶68. All of the letters were mailed from Massachusetts to Local 264 in New York. Id.

Subsequent to Mr. Elkins' termination in February, 2003, Local 264 officials wrote several letters to Mr. Elkins regarding their representation of him. Elkins Affidavit at ¶69. All of those letters were sent from New York to Mr. Elkins at his home in Massachusetts. Id.

Subsequent to Mr. Elkins' termination in February, 2003, Local 264 officials placed approximately 6 phone calls to him regarding their representation of him and he placed approximately 3 phone calls to Local 264 regarding their representation of him. Elkins Affidavit at ¶70. In relation to those calls, Mr. Elkins spoke on the phone to Local 264 officials approximately 3 times after his termination in February, 2003. Id. at par. 70.

Subsequent to Mr. Elkins' termination in February, 2003, Mr. Elkins sent at least several dozen facsimile transmissions to Local 264 regarding different aspects of their representation of him. Elkins Affidavit at ¶71. All of these facsimiles were transmitted from Massachusetts to Local 264 at their address in New York. Id.

In approximately 2001, Local 264 organized Shuttle America pilots. Elkins Affidavit at ¶64. Brian O'Donnell Affidavit.

The pilots who were organized by Local 264 and who were members of Local 264 included approximately 24 or 25 Shuttle America pilots who either lived in Massachusetts or worked out of Hanscom Field in Bedford, Massachusetts, or both. Id.

Until 2001 or 2002, Local 264 of the Teamsters had approximately 25 members who were Shuttle America pilots who either lived in Massachusetts or worked out of Hanscom Field in Bedford, Massachusetts. Elkins Affidavit at ¶65.

Brian O'Donnell is an individual living in West Barnstable, Massachusetts. O'Donnell Affidavit. Mr. O'Donnell is currently employed as a pilot by Shuttle America. Id. Mr. O'Donnell was hired by Shuttle America in 1998 and has been continuously employed by the Company since that date. Id. Mr. O'Donnell is currently a member of Local 264 of the Teamsters, and has been a member of the Union since approximately 2001. Id. During the whole time period that he has been employed by Shuttle America and has been a member of Local 264, Mr. O'Donnell has lived in West Barnstable, Massachusetts. Id. There are at least 2 other current pilots of Shuttle America planes who are members of Local 264 who also reside in Massachusetts. Id.

### 2.    Breach of Duty of Fair Representation.

Mr. Elkins was represented in the arbitration of his first grievance by Attorney Giroux.

Mr. Giroux was and is a law partner of Defendant Catherine Creighton.

Between the time that Mr. Elkins was first represented by Attorney Giroux and the time of his arbitration over his second termination, Mr. Elkins filed two complaints with the New York State Bar regarding Attorney Giroux. Complaint at par. 31-38.

At pages 14 to 15 of the Complaint in this action, Plaintiff has listed a number of improper actions Ms. Creighton engaged in at the arbitration of the second termination. Among

the items listed are Ms. Creighton's public verbal abuse of Mr. Elkins, her refusal to sit next to Mr. Elkins at the hearing, her refusal to raise the issue of disability discrimination at the arbitration, her failure to withdraw as Mr. Elkins' representative knowing that her partner had a conflict of interest in relation to Mr. Elkins because of the disciplinary complaints, her failure to withdraw as Mr. Elkins' representative at the arbitration knowing that if she fully presented Mr. Elkins' claims about his medical reason for not attending ground school her law partner, Attorney Giroux would have to be a witness and she would have to be forced to withdraw as representative, her failure to call her law partner Mr. Giroux as a witness, and her engaging in an off the record conversation with the arbitrator and opposing counsel out of the presence of Mr. Elkins (after which she forced Mr. Elkins to drop his claim that he could not attend the training for medical reasons). Ms. Creighton took this last action apparently based on a threat by the arbitrator to allow counsel for Shuttle America who was conducting the hearing for Shuttle America to testify, which would have required Attorney Creighton to call her partner Attorney Giroux as a witness.

## ARGUMENT

### 1.    The Court has personal jurisdiction over Local 264.

For several years Local 264 has had many union members who work out of Massachusetts and reside in Massachusetts. Those members have paid union dues to Local 264 since approximately 2001. According to the O'Donnell Affidavit, Local 264 still has between 1 and 3 members who live in Massachusetts and who work out of Massachusetts. By having union members in Massachusetts for several years, by collecting dues from those members for several years and by performing whatever functions it performed for those members who are

Massachusetts residents for several years, Local 264 must be deemed to be "doing business in" Massachusetts.

In addition to the members it has dealt with over the years, from 2001 until at least 2003, Local 264 had enough dealings with Mr. Elkins to be considered to have transacted business in Massachusetts. Mr. Elkins communicated with Local 264 by telephone and facsimile on several dozen occasions. Local 264 communicated with Mr. Elkins by phone and mail on a number of occasions. Over several years, Mr. Elkins made at least 10 payments to Local 264 for the services they were obligated to provide to him, and the total of his payments was over $1,400.00. By its actions in servicing and dealing with its members other than Mr. Elkins, and by its actions in dealing with and servicing Mr. Elkins, Local 264 has transacted business in Massachusetts.

Plaintiffs' claims against Local 264 are based upon the deficient, bad faith nature of the representation provided by Local 264, the very matters for which Mr. Elkins was paying Local 264 and communicating with it, and the very matters for which Local 264 was communicating with and receiving dues from its other members. Plaintiffs' claims have arisen from Defendant's transaction of business in Massachusetts. It is appropriate for this Court to exercise personal jurisdiction over Local 264 pursuant to M.G.L. c.223A §3(a).

The Court may also exercise Long-Arm jurisdiction over Local 264 because it has caused tortious injury in Massachusetts by an act or omission outside the Commonwealth, and it regularly does business in Massachusetts and engages in a persistent course of conduct in Massachusetts.

Mr. Elkins was injured due to actions taking place outside of Massachusetts. However, due to the extreme emotional distress Local 264's actions caused Mr. Elkins to suffer, as well as the fact that its actions caused Mr. Elkins' spouse to suffer a loss of consortium, Local 264 has

12

caused a tortious injury <u>in Massachusetts.</u>  See, e.g. <u>Darcy v. Hankle, supra; Noonan v. The Winston Company, supra.</u>  For the reasons discussed earlier, namely the representation of various members who are residents of Massachusetts and its activities in relation to Mr. Elkins, Local 264 both "regularly does or solicits business" in Massachusetts and additionally, has engaged in a "persistent course of conduct" in Massachusetts.  It is appropriate for the Court to assert jurisdiction over Local 264 pursuant to M.G.L. c.223A §3(d).

The next relevant question is whether it is constitutional for this jurisdiction over Local 264 to be exercised.  The exercise of such jurisdiction is indeed in accordance with the Constitution, either as "general jurisdiction" or as "special jurisdiction."

Based upon Local 264 having members in Massachusetts for a series of years, collecting dues from those members for a series of years, representing those members, and collecting agency fees and dealing with Mr. Elkins in a representative context, Local 264 has engaged in a continuous and systematic course of activity in Massachusetts.[2]  Local 264 has engaged in enough of a continuous and systematic course of activity in Massachusetts to subject it to <u>general</u> jurisdiction in Massachusetts.

The exercise of <u>specific</u> jurisdiction is appropriate as well.

The claim underlying this litigation relates to the quality of Local 264's representation of Mr. Elkins in a work-related arbitration.  Such a claim arises directly out of and relates to, Local 264's contacts with Massachusetts, namely obtaining union members and servicing those union individuals in exchange for dues or agency fees.

_____

[2] As was set forth by the Court in <u>Workgroup,</u> at 109-110, in order for a Defendant to be deemed to be transacting business in a state it is not necessary that a Defendant be physically present in the state.  Additionally, even just a few actions on a Defendant's part can often suffice to satisfy the Long-Arm Statute's threshold for transacting business.

13

Local 264's activities in this regard have been purposeful and voluntary. Local 264 chose to have members in Massachusetts, and accepted dues or agency fees from those people in exchange for the obligation to represent those employees when such representation was required.

By choosing to have members and an agency fee paying individual in Massachusetts, knowing that it was being paid by their dues or an agency fee to represent these individuals as the need required, it was clearly foreseeable to Local 264 that it could be subject to suit in Massachusetts.

The last matter to be considered is whether the "Gestalt factors" are present. Workgroup, supra at 114.

As for the first "Gestalt" factor, although it would undoubtedly be burdensome to Local 264 to have to appear in Massachusetts rather than New York, it is almost always inconvenient for a party to litigate in a foreign jurisdiction. As Local 264 cannot demonstrate that the exercise of jurisdiction in the present case is onerous in any special, unusual or other significant way, this factor weighs in favor of the Court's exercise of jurisdiction. See, e.g. Workgroup, supra at 115.

Regarding the second factor, Massachusetts has an interest in this action because it has an interest in seeing that employees working in Massachusetts but who are represented by labor unions not physically located in Massachusetts, have a fair chance to litigate claims against those labor unions.

With regard to the third factor, it would be very much in Mr. Elkins' interest to be able to litigate this matter in Massachusetts, near his home, rather than having to obtain counsel in the Buffalo or Pittsburgh areas and have to travel to meet with counsel and litigate the case. The burden in this regard is much greater on Mr. Elkins as an individual than the burden on Local 264 to have to come to Massachusetts to litigate this case.

As to the fourth factor, it appears that there is no reason to believe that New York has a greater interest in the resolution of this controversy than Massachusetts does. The witnesses to this matter are in various states in addition to New York and Massachusetts. As Mr. Elkins is an individual with limited resources, it is less onerous to require Local 264 to litigate this matter in Massachusetts than to require Mr. Elkins to litigate it in New York.

As to the fifth factor, it does not appear that the social policies of New York or Massachusetts are an issue in this case or in conflict in this case and therefore that factor is not relevant.

Accordingly, when all of the Gestalt factors are weighed, the factors are either neutral or favor the litigation of this matter in Massachusetts. Based upon all of the above, the exercise of jurisdiction in Massachusetts will not offend traditional notations of fair play and substantial justice.

This Court has subject matter jurisdiction over Local 264 and it would be completely in accordance with the U.S. Constitution for the Court to exercise that jurisdiction.

**2.    The Duty of Fair Representation.**

Paragraphs 41-44 of the Complaint contain numerous instances of the representation by Ms. Creighton being either deficient or inadequate. These specific allegations are sufficient to meet the standard of showing that the duty of fair representation owed to Mr. Elkins was breached, and that the union represented him in a perfunctory, arbitrary, capacious and bad faith manner.

In relation to this analysis, Plaintiff urges the Court to look at the allegations as a whole.

When the various actions of Ms. Creighton are viewed in the prism of her ethically questionable actions and her clear hostility towards Mr. Elkins, it can be seen that the actions

15

complained of are not (as Defendants categorize them) mere differences in strategy but rather, amount to arbitrary and bad faith actions which caused Mr. Elkins harm.

Prior to the arbitration at issue, Mr. Elkins had filed two complaints with the Bar of the State of New York regarding the conduct of Ms. Creighton's law partner, Attorney Giroux. Indeed, Mr. Giroux withdrew from representing Mr. Elkins, presumably due to these Bar complaints Mr. Elkins had filed. It bears little elaboration that if Mr. Giroux had a conflict of interest in representing Mr. Elkins (due to the complaints filed with the New York State Bar), Ms. Creighton would have suffered from the same conflict of interest. Arguably, Ms. Creighton was committing an ethical violation when she persisted in her representation of Mr. Elkins despite her conflict of interest.[3]   Secondly, Ms. Creighton knew that Mr. Elkins was claiming that one of the reasons he had not attended the ground school was that he was medically unable to attend it. Ms. Creighton also knew that Mr. Giroux, her law partner, was a witness both to the communications about this from Mr. Elkins and additionally that Mr. Giroux was the individual who had communicated this medical excuse to Shuttle America, the employer. Accordingly, in order to properly present the "medical excuse" defense, it would be necessary for Ms. Creighton to call her law partner Mr. Giroux as a witness.

The need to call Mr. Giroux as a witness presented Ms. Creighton with a similar ethical dilemma. Specifically, if Mr. Giroux would be unable to represent Mr. Elkins because he would be called as a witness in the case and therefore could not serve as representative, his law partner Ms. Creighton would suffer from the same impediment. Not only did Ms. Creighton insist upon

---

[3] One may question why Ms. Creighton agreed to represent Mr. Elkins in light of the obvious ethical conflict she would be placed in by representing him. Plaintiffs suggest that the reason was self-interest, in that by continuing to represent Mr. Elkins Ms. Creighton's (and Mr. Giroux') law firm would continue to receive fees on the case and additionally, Ms. Creighton could control whether or not Attorney Giroux was called as a witness. Had a different representative been assigned to Mr. Elkins, Mr. Giroux might not have been able to avoid being called as a witness in the case.

16

taking up Mr. Elkins' representation, and declined to withdraw from the case, but she apparently felt she could hide this conflict by simply not pursuing the "medical excuse" issue and thus not calling Mr. Giroux as a witness.

This issue came to the forefront during the arbitration itself when the arbitrator indicated to Ms. Creighton (in an off the record meeting she had with the arbitrator and opposing counsel to which Mr. Elkins was not privy) Complaint at par. 43, that if Mr. Elkins insisted on continuing with his "medical excuse" defense, the attorney for Shuttle America would be allowed to testify. As Ms. Creighton realized this would force her hand in terms of calling Mr. Giroux as a witness, and thereby expose her conflict of interest, she prevailed upon Mr. Elkins not to pursue this defense. The reason Ms. Creighton prevailed upon Mr. Elkins not to pursue this defense was simply for her own self-interest, so that she would not have to withdraw from the case and would not be in a position of having to call her law partner as a witness.

With regard to hostility toward Mr. Elkins, the Complaint adequately sets forth such issues. The evening prior to the arbitration hearing, despite Mr. Elkins indicating he was in a psychologically compromised condition, Ms. Creighton yelled at him, she cursed him in public and then she led him to believe that she was quite resentful of having to handle his case. At the hearing itself she would not even sit next to him, although clearly it would have assisted her representation of him to do so. Complaint at par. 41-42.

It is in this light, that the questionable tactical decisions by Ms. Creighton must be viewed. An attorney serving as a union representative failed to present a number of defenses and failed to introduce significant evidence during the hearing and otherwise inadequately represented Mr. Elkins. Complaint at par. 43-44. The attorney doing this was in the very least acting questionably in an ethical sense in representing Mr. Elkins and at the worst, had

committed a number of ethical violations by agreeing to represent him and by continuing to represent him. The attorney clearly had hostility toward Mr. Elkins which was demonstrated immediately prior to the hearing. It is reasonable to assume that Ms. Creighton was hostile toward Mr. Elkins for filing complaints with the Bar of the State of New York against her law partner, Mr. Giroux.

In light of all of these factors, for the purposes of ruling on Defendant's Motion to Dismiss, Plaintiff has adequately set forth grounds upon which it could be found that the representation of Mr. Elkins by Ms. Creighton was perfunctory, arbitrary and in bad faith, and thus a violation of the duty of fair representation.

### 3.    The State Law Tort Claims are not Preempted.

Local 264 claims in its Brief that the claims against it for intentional infliction of emotional distress and negligent infliction of emotional distress are preempted by Plaintiff's federal duty of fair representation claims. However, Defendant acknowledges that "state law duties will only escape preemption if they are wholly outside the ambit of those obligations circumscribed by the federal duty." Defendant's Memorandum at 16. Plaintiff asserts that the actions of Ms. Creighton giving him grounds to assert claims for intentional and negligent infliction of emotional distress, are indeed outside the union's representational duties.

As discussed above, Ms. Creighton's actions toward Mr. Elkins causing him emotional distress were based upon her denial of her ethical obligation to refuse to represent Mr. Elkins, or to withdraw from representing him based both upon the conflict of interest presented to her by Mr. Elkins' complaints to the New York State Bar against her partner Mr. Giroux, as well as her obligation to withdraw once it became apparent that she would have to call Mr. Giroux as a witness. Ms. Creighton's bad will toward Mr. Elkins (resulting in her intentional and negligent

18

infliction of emotional distress upon him) is due to her anger at him for filing charges with the Bar against a partner in her law firm and for Mr. Elkins taken actions which might deprive her firm of a fee. The unique nature of this situation takes the facts of this case outside of the usual representative capacities of a union agent. As a result of the unique aspects of the facts of this case, Mr. Elkins' state law claims are indeed "wholly outside the ambit" of the obligations circumscribed by the federal duty.[4]

## 4. The Complaint Adequately States a Claim for Intentional Infliction of Emotional Distress.

Defendant claims that the Complaint does not adequately state a claim for intentional infliction of emotional distress. Defendant would have the Court believe that the actions of which Mr. Elkins complains are merely "petty oppressions and other trivialities." That is far from the truth. In attending the arbitration of his termination grievance, Mr. Elkins was in a situation where his job and indeed his career as a pilot was at risk. Mr. Elkins was under the care of a psychiatrist for the stress this had caused him, and he made Ms. Creighton aware of his weakened condition. Despite her knowledge of Mr. Elkins' weakened condition and the importance of the hearing to him, Ms. Creighton proceeded to verbally abuse Mr. Elkins in public, cast serious doubt upon her ability and desire to represent Mr. Elkins and placed Mr. Elkins in dire fear that his interests would not be represented in a case which was crucial to him. As a result of this conduct Mr. Elkins' mental condition deteriorated both immediately before the hearing and in the weeks and months after it. As is discussed above, Ms. Creighton took these actions due to hostility toward Mr. Elkins because of complaints he had filed against a partner of hers with the New York State Bar. Given these circumstances, Plaintiff asserts that the conduct

---

[4] Plaintiff notes that to whatever extent there may be doubt that he could recover damages for emotional pain and suffering against Local 264 for its having breached the duty of fair representation owed to him, as such damages would be recoverable by Mr. Elkins under his state law claims, preemption would not be appropriate.

of which he accuses Ms. Creighton meets all of the elements for a claim for intentional infliction

of emotional distress, as her actions were outrageous. As Ms. Creighton was an agent of Local

264, Local 264 is fully responsible for her improper conduct.[5]

## CONCLUSION

For all of the foregoing reasons, it is respectfully requested that the Motion of

Local 264 to Dismiss this action be denied.[6]

Respectfully submitted,
D. LYLE ELKINS and MARTHA ELKINS
By their Attorney

Mitchell J. Notis, BBO # 374360
LAW OFFICE OF MITCHELL J. NOTIS
370 Washington Street
Brookline, MA 02445

DATED:  November 22, 2005                Tel.: (617) 566-2700

## CERTIFICATE OF SERVICE

I, Mitchell J. Notis, hereby certify that on ___11/23/05___ I caused to be served upon counsel
for all parties of record, a copy of the within Plaintiff's Opposition to Defendant's Motion to
Dismiss by mailing the same by first class mail, postage prepaid.

Mitchell J. Notis

---

[5] With regard to the claim for negligent infliction of emotional distress, the "negligence" of which Mr. Elkins
complains is the fact that Ms. Creighton had an obligation, after being made aware of his weakened psychiatric
condition, not to be abusive to him.

[6] Should the Court be inclined to grant Local 264's Motion to Dismiss for lack of subject matter jurisdiction, despite
Plaintiffs' arguments, Plaintiffs respectfully request that pursuant to 28 U.S.C. §1406(a) and 28 U.S.C. §1631 rather
than dismissing this action, the Court order the case transferred to either the U.S. District Court for the District
encompassing Buffalo, New York or the U.S. District Court for the District encompassing Pittsburg, Pennsylvania
Plaintiff notes that in light of the 6-month Statute of Limitations for filing an action for breach of the duty fair
representation, the extremely short nature of that statute, and the fact that the time limit for filing an action against
Local 264 has now passed, it would be in the interest of justice for this action to be transferred to another District
Court rather than for it to be dismissed. A dismissal without a transfer would preclude Plaintiff from being able to
litigate his duty of fair representation claims against Local 264.

## AFFADAVIT

I, Brian Joseph O'Donnell of 172 Church Street, West Barnstable, Massachusetts, hereby declare under oath the following: I am currently employed as a pilot by Shuttle America, and rated as a Captain on the SAAB 340. I was hired on December 28, 1998 and have been continuously employed by the company since that date. I am a current member of Local 264 of the International Brotherhood of Teamsters, and have been since that union came to represent the Shuttle America pilot group in 2001. I have resided at the above address since October 1998. I was based at Hanscom Field in Bedford, Massachusetts from its opening in December 1999 until it closed as a Shuttle America crew base in November 2002. At its peak there were approximately 24 pilots based at Bedford, of that group about one third of them resided in Massachusetts. To the best of my knowledge there are at least two other current union pilots that also reside in this state.

Signed under the pains and penalties of perjury this 20th day of November 2005.

Brian Joseph O'Donnell

## AFFADAVIT

## AFFIDAVIT OF D. LYLE ELKINS

I, D. Lyle Elkins, hereby state the following under oath:

1.    I reside in Forestdale, Massachusetts.

2.    On July 1, 2005, I left for our summer home in Port Maitland, Novas Scotia for an extended stay at the agreement of my treating physicist and my therapist. Both believed that if I were to leave the Cape Cod area and its proximity to airports, it might assist in my recovery. After my wife retires under early retirement on February 1, 2005, we intend to make Port Maitland, Nova Scotia our permanent residence.

3. Prior to the Chief Pilot notifying me that I had been taken off the Shuttle America payroll in a letter of February 11, 2003, I had a conversation with Don Triechler, Director, Teamster's Aviation Division, Local 747, (hereinafter Union's Aviation Director), in which I was told that Shuttle America might place me on leave without pay if I failed to attend the February 3 ground school, I and the Union were of the belief that the above mentioned letter reflected this status since I received no word from the union of anything to the contrary.

4. After filing a grievance relating to the stopping of my pay without the assistance of the Union, I sent a copy of same to Union's local agent for Shuttle America pilots, Scott Chismar, (hereinafter, "Union Agent"), Attorney Giroux, and its treasurer, Ron Lucas, (hereinafter "Union Treasurer"). The Shuttle America Director of Operations advised me that the grievance was being returned due to its lack of conformity with Article 19 of the Contract.

5. On March 22, 2003, I sent a letter to the Union Agent. I told the Agent that I was at a loss of the grievance not being in conformity since he had earlier sent the Agent, Attorney Giroux, and the Treasurer a copy of the grievance and received no notice from the Union or Attorney Giroux of any nonconformity.

6. After leaving two telephone messages with the Union Treasurer that went unanswered, I sent a letter to him seeking his assistance in relation to the pending grievance. No response was received.

7. On March 26, 2003, I wrote the Union's Aviation Director, Don Triechler, seeking his assistance. No response was received. At no time was I made aware of Local 264 being an agency of Local 747.

8. On March 27, 2003, the Union Agent, telephoned me and told me to place a signed grievance concerning my being removed from the payroll in the mail directed to him. (Four part form, after filing, one copy marked Grievant is returned to him.) Thereafter, the Agent would attach my previously sent summary and file the grievance with Shuttle America.

9. On April 3, 2003, my requested a copy of my personnel file arrived. After reviewing its contents, I was put in such shock to the point where medication was required upon finding a falsified document signed by Shuttle America's Director of Operations, that the former had, "voluntarily resigned" as of February 3, 2003 due to his failure to attend ground school scheduled for that date.

10. On April 4, 2003, I sent a letter to the Union Agent with the falsified document enclosed asking that a grievance be filed immediately for wrongful dismissal.

11. On April 5, 2003, to expedite the filing of the wrongful dismissal grievance, I sent a signed grievance form and sent it to the Union Agent.

2

12. On April 8, 2003, I sent another letter to the Union Agent, among other things, requesting that the pending wrongful dismissal grievance contain a damage claim for intentional/negligent infliction of emotional distress together with back-pay.

13. On April 15, 2003, I sent a letter asking the Union Agent if he had received a copy of the signed grievance. No response was received.

14. On April 25, 2003, I sent the Union Agent information on previously sent and received correspondence from Shuttle America to allow him to get a better overview of the grievance. No response was received.

15. Shortly thereafter, I received a note from the Union Agent telling me to complete the enclosed grievance "as you see fit" and return it to him for filing. I promptly did same and sent it to Union's Agent.

16. On May 5, 2003, I sent another letter to the Union Agent requesting again confirmation of the filing of the wrongful discharge grievance and a copy of same. No response was received.

17. On May 5, 2003, I sent the Union Agent a letter with a check enclosed for $47.04 for union dues. After my reinstatement and subsequent firing, I had been paying my union dues directly to Local 264 since it could not be deducted from my pay check..

18. On May 18, 20033, I telephoned the Union shop steward for Shuttle America pilots, David Gale, asking him to get a copy of the grievance. He said that he would speak to the Union Agent. I never received any further response.

19. On May 11, 2003, I sent another letter to Union's Aviation Director Treichler seeking his intervention to obtain a copy of the grievance. I received no response.

20. On July 20, 2003, I sent once again another letter to the Union's Agent Chismar seeking a copy of the grievance. Enclosed in this letter were my union dues for June and July, 2003. No response was received.

21. On July 29, 2003, I received a message on my answering machine from the Union Agent. He said, "We want to do it on August 22 in Pittsburgh..." He further said that Shuttle America wanted to have it in Fort Wayne; however, he was able to have it set for Pittsburg since it would be easier travel for me. I sent a letter to him asking what "it" was. I assumed "it" to be a System Adjustment Board hearing. Since I had yet to receive a copy of either the filed wrongful discharge grievance or a copy of the petition that is required to be filed with the board chairman before a hearing date could be set per Article 20, I did not understand how a hearing date could be set. I again requested copies of both grievances that should be on file and I outlined my efforts to obtain same from others. I also advised this Agent that I could not attend any hearing on August 22 due to legal business in Canada; I would not be available until sometime in September. No response was received for rescheduling.

22. On August 13, 2003, since no confirmation was received about rescheduling, I sent a certified letter to the Union Agent explaining Article 20 of the Contract. Again, a request was made for copies of the grievances and the petition. No response was received.

23. On September 1, 2003, I sent a letter to the Union Agent requesting counsel be appointed. Again, a request was made for copies of the grievances, Shuttle America's responses, and copy of the required System Adjustment Board petition required for the August 22, 2003 arbitration hearing. No response was received.

24. On September 16, 2003, I sent to the Union Treasurer a letter seeking his assistance and providing an outline of all the aforementioned events together with copies of all correspondence. No response was received.

3

25. Per the attached partial copy of my Bank statement from Cape Cod Bank and Trust, I discovered that on September 22, 2003, eight checks written earlier to Local 264 had been deposited for payment. However, one check was missing (#1276) from the monthly union dues checks that I had sent earlier, a copy of which is shown in my May 6, 2006 letter.

26. Although I only have copies of check numbers 1276, 1305, and 1304, I have requested copies of all.

27. To the best of my memory to this point, the $900.00 check was written in January, 2003 after my award for all union dues owed up to the first arbitration award. This was prior to my receiving my backpay which never took place until July, 2003. The other seven checks reflect my monthly union dues paid after my February 3, 2003 firing directly to Local 264. No notice was given to me prior to all of the aforementioned checks being cashed at once on September 22, 2003.

28. Since Local 264 would not respond to my repeated requests for a copy of the alleged filed grievances, I ceased sending union dues.

29. On October 7, 2003, I had Attorney Steven MacDonald, an associate, sent Thomas Dziedzic, outgoing President of Local 264, a copy of the letter/information package sent Union's Treasurer. No response was received.

30. On November 14, 2003, the Union Treasurer telephoned me and left a number. I returned the call and left message to call. On November 17, 2003 Union's Treasurer Lucas called me to say that he was moving up to President of Local 264. I stressed my desire to resolve matter and to receive copies of grievances, Shuttle America's responses to the grievances, and a copy of the petition. The Union's Treasurer said he would get the requested documents from the Union's Agent.

31. On November 24, 2003, the Union's Treasurer called to tell me that he was trying to have Shuttle America take me back. The Union's Treasurer said when he asked the Union Agent for copies of the grievances, the Union Agent's eyes glazed over "like a deer caught in headlights." Union's Treasurer said he would get a copy of grievance for me.

32. On December 5 or 6, 2003, I called the Union Treasurer to check on status. I left message for him to call me.

33. On December 9, 2003, I called Union's Treasurer. The Union's Treasurer asked if I would work with a new agent. I agreed provided I always had direct access to him. He agreed. He said that the new agent would present my case in front of System Adjustment Board. I immediately said that the last time both spoke, the Union's Treasurer told me that the matter would go to arbitration bypassing the System Adjustment Board since such a hearing would be a waste of time and money. I was told that 99.99% of time these hearings were deadlocked. The Union's Treasurer agreed; however, he said that Shuttle America believed it could "sway" one of the two Union's System Adjustment Board members to its side. I asked again where were his copies of the grievances? Again, I was promised same would be forthcoming.

34. On December 19, 2003, I received a message to call the Union's Treasurer.

35. On December 20, 2003, I returned the call and left message.

36. On December 22, 2003, the Union Treasurer said he and Union's Aviation Director were playing "phone tag" on setting a date. I told Union's Treasurer that former was still waiting for copies of the requested material.

38. On December 24, 2003, after expecting to hear from the Union's Treasurer on December 24, when no call was received by 3:40 p.m., I called him. The Union's Treasurer said he had called

4

Shuttle America that morning to ask if it had a copy of the grievance. It said it did and would fax him a copy. He had yet to receive it. When he did, he would fax copy to me after asking for and receiving my fax number. I told him it was rather odd that the Union's Treasurer and incoming president as of January 1, 2004 had to go to Shuttle America to obtain copy of grievance when the Union copy should be on file already. He was also asked if a copy of petition or a copy of Shuttle America's responses to grievances were in the file. He said he was not aware. I told him that not only should Shuttle America have sent him a certified mail copy of its response, it was required to do same for Union. I told the Union's Treasurer that a lawsuit would be filed by the end of December, 2003 against the Union for bad faith representation and Shuttle America for wrongful dismissal if the matter was not resolved by that point in time. The Union's Treasurer said that one had to "do what you have to do."

37. On January 5, 2004, Ronald Lucas, now President of Union, sent a letter to Employer seeking copies of all documents, letters and/or memorandums, grievances filed by me after February 1, 2003 together with any correspondence between Union and Employer. He sent a copy of his letter to me. The Teamsters, if any grievance had been filed in April, 2003, should have already had it on file.

39. On January 7, 2004, I sent a letter to Mr. Lucas thanking him for his efforts.

40. On January 28, 2004, Richard Lipsitz sent me a letter advising me that he had replaced Mr. Chismar as my Teamsters representative.

41. On February 11, 2004, I went to Buffalo to meet with my new Teamsters representative. When I went into the conference room, a lady was present who turned out to be Attorney Catherine Creighton. It upset me since I had no idea she would be present and she was a partner with my former Teamsters attorney, Joe Giroux whom I had recently reported to the New York bar.. I expressed my displeasure and discomfort with this situation. I had wanted counsel outside of this office. Ron Lucas mentioned that another office may handle my pending arbitration. In part, we discussed emotional duress damages. In a letter from her to Ron Lucas of June 29, 2004, she writes in the second paragraph that I appeared to accept her legal opinion that I was not entitled to emotional duress damages from the arbitrator. This statement is incorrect. At this meeting, we had a major disagreement over this issue. I attempted to point out to her that case law has clearly established that under the Railway Labor Act, a mental duress claim associated with a wrongful discharge that is intertwined with the contract to a "minor dispute" and the state and federal courts lack jurisdiction over any independent action of this mental duress tort. Ironically, in her filed petition under Article 20 of the CBA, page 3, second last paragraph, last line, she writes, "The employer's position seems designed to drive the grievant mad." And, page 4, last line, Attorney Creighton writes that, "The grievant and the Union also request compensatory and emotional distress damages the grievant incurred as a result of his second improper discharge." Note that after I had filed a Complaint on December 29, 2003, the cooperation increased greatly from the Union. Based on this cooperation, I filed a motion on February 19, 2004 to have the Complaint dismissed. No service took place.

42. On March 15, 2004, I received a letter from Attorney Creighton officially notifying me of her being my attorney. Although I really did not want it this way, I hardly could force the issue and end up having no attorney at all. I sent a polite response letter.

43. On May 19, 2004, I had no further contact with Attorney Creighton until May 19, 2004. It was a pre-arranged conference call with her, Richard Lipsitz, and me. The conversation was a very general one about the arbitration scheduled for June 10, 2004. I was told that she would

5

meet with me at the hotel the evening before the hearing to discuss the case in detail. At no time was I advised that she had no intent to pursue mental duress damages.

44. On June 9, 2004, I met with Attorney Creighton and Richard Lipsitz in the bar area of the hotel. It was a bit crowded because the main dining room had been closed off for re-carpeting. Initially, the conversation was cordial with my mentioning that she seemed to have a good grasp of the facts that brought us here. She and I discussed various documents. For the first time, I became aware of the existence of a response from Shuttle America of the April 28, 2003 grievance by my seeing briefly this document. I could not read anything on it before it was put away. It was filed the next day as an exhibit. I have yet to read it or receive a copy of it. When she finished, I mentioned to her so that she should be aware that I had become more fragile mentally since May and that I was not doing well. Because of my worsening mental condition, I had to increase my medication. The cordial conversation changed direction to one of hostility on her part. She said that she did not want to hear anything about my mental health since it had nothing to do with the case. In not raising my voice once, I thereafter tried to explain to her that my mental health was one of the most important parts of this case. One, for medical reasons, I could not attend the ground school. I told her that case law makes it clear that I have no independent cause of action for mental duress. The Employer fired me for retaliation in losing the first grievance. Thereafter, she once again began raising her voice. For the second time, I asked her to keep her voice down because of it catching the attention of the other patrons. She then told me that I was wrong and asked if I had any case law. I told her if she had made this request earlier and not just hours before the hearing, I would have provided her with it to offset her differing opinion about mental duress damages. I then asked her if she had case law to support her position. She then raised her voice once more and as she rose from her chair said to the effort of, "I didn't come all the way down here to put up with your bullshit." She then told me in a raised voice to "Go fuck myself" or words similar. I stood to allow her to pass by me. As she almost brushed against my nose in passing, she spoke the words to the effect of, "You know what your fucking problem is, you rub people the wrong fucking way." Thereafter, I think she went to a table where at least one of the union members of the System Adjustment Board was seated.

45. I was absolutely stunned, embarrassed, and humiliated with the restaurant patrons looking on. I spoke briefly to Mr. Lipsitz. He said that if you two don't shake hands, you will be in big trouble. I was simply shocked by his comment. Shortly thereafter, Attorney Creighton returned to give a rather hollow apology. I accepted it; I had little option but to keep her as the attorney only hours from the hearing.

46. I left the bar to take more medication and to call my wife to express my impossible situation. For the balance of the night, I spent roaming the hallways, walking outside, or looking at the walls. I got no sleep.

47. On the arbitration date of June 10, 2004, at approximately 8:00 a.m., I met with Mr. Lipsitz and Attorney Creighton. We spoke of things other than the case. She did mention that she could not see her daughter in a play because of her having to do this hearing to-day. I clearly felt that she did not to be there.

48. Once we went into the hearing room, I sensed immediately that Attorney Creighton had not forgotten the events of the previous night. She directed me to sit in a certain chair. Then, Mr. Lipsitz sat between me and her making any direct communications impossible. On one occasion,

6

I had to write a note to immediately bring something to her attention. On another occasion, I had to stop testimony so that I could speak to her.

49. Although in a short note of February 16, 2004, she had requested me to get a medical report regarding my medical excuse, she could not get this rather important document into evidence because of her failure to lay an adequate foundation. It not only laid a foundation for my medical excuse but also one for mental duress damages. I almost lost it mentally when she screwed up. Fortunately, Dr. Stearns had given me medication to take to keep me calm.. It was the only way I was able to make it through the arbitration.

50. Another very stressful moment during the hearing was the only witness called by the Employer, Mr. Waldman, the chief pilot. Since most of the important letters of the Employer were signed by the director of operations, Mr. Stevenson, I was shocked that she did not object to Mr. Waldman interpreting letters signed by Mr. Stevenson. Mr. Waldman said that he had, "co-authored them." Mr. Stevenson was sitting directly across from her.

51, Although Mr. Stevenson had made some damaging statements under oath at the initial four member board hearing, Attorney Creighton did not obtain a copy of this transcript for impeachment purposes. Actually, she was not even at this hearing. However, Mr. Stevenson had said it was his routine policy to terminate employees who failed to show for ground school. It was pointed out to him by Ron Lucas, now the local union president, that I was not a probationary employee but one reinstated by the arbitrator. Thus, before I could be terminated, all due provisions of the contract had to be followed. Mr. Stevenson left Shuttle America within a month after this hearing. If called as a witness, I believe he would have been a strong one in support of my grievance. He sat directly across from her during the arbitration.

52. At the end of the hearing, the Employer's counsel stated that he was now forced to testify based on my testimony. He felt this craving obligation since my testimony was not in line with conversations he had with Attorney Giroux on January 27-29?, 2003. This attorney failed to subpoena Attorney Giroux . At this point, the arbitrator called the attorneys out of the room.

53. After the arbitrator returned, he told Attorney Creighton that she should speak, to "her client." In the hallway, she told me that if I were not agreeable to dropping my medical excuse, the arbitrator was going to let the Employer's counsel testify to conversations he and Attorney Giroux had about my medical reasons for not attending ground school. I was absolutely shocked that the arbitrator would almost threaten and force me to drop my medical excuse. I told her that she must be kidding. With people nearby at the front desk, she once again went into her raised voice mood. She clearly was insinuating that any testimony from opposing counsel would hurt me and Attorney Giroux, her fellow partner, would agree with this testimony.

54. Based on what I considered a threat and based on my impossible position and mental state at that moment, I basically said do whatever you want. In hindsight, Attorney Creighton actually had a conflict in putting me in this impossible position since if I waived my medical excuse, it would get her off the hook for her failure to lay an elementary foundation to get the critical medical report into evidence. Interestingly enough, nothing was entered into the record of my dropping my medical excuse.

55. I sent a letter to Ron Lucas complaining of her performance and ill treatment towards me. [I requested new counsel, in vain.

56. Attorney Creighton sent a letter to the Teamsters justifying her position on mental duress. Her star case, Hawaiian Airlines, Inc. v. Norris, is limited to an action involving actions against

7

state public policy, i.e., retaliation against an employee for making use of the "Whistleblower Statute of Hawaii" and a separate action based on the statute itself.

57. On July 15, 2004y wife, Martha, requested the assistance of Gary Witlen, Director of Legal Services for the International Teamsters. He said that he could not assist her; he would not even get copies of the transcript of the four member board or a copy of the grievance response from Shuttle America. He said it was the responsibility of Local 264.

58. On August 12, 2004, Dr. Stearns sent a letter to Mr. Lucas advising him of my declining mental health. He asked for copies of the transcripts and a copy of the grievance response from Shuttle America. Mr. Lucas ignored the request for a copy of the grievance response from Shuttle America.

59. On September 25, 2004, I requested again a copy of the response to the filed grievance.

60. On September 27, 2004, despite the fact that countless requests have been made for a rather obvious document that was filed at the arbitration hearing, Attorney Creighton had the gall to send me the attached letter to apparently mock me. (Exhibit "N")

61. On October 4, 2004, in response, I sent my last and final letter to the Teamsters.

62. In total, at least fifteen requests have been made to the Teamsters for a copy of the response of Shuttle America to my wrongful discharge grievance that the union allegedly filed on April 28, 2003. I had the same problems with the first grievance and dealing with the attorney, Joe Giroux, a partner of Attorney Creighton.

63. Unknown to me until after the arbitration, my wife brought to my attention that within the same law firm of Creighton and Geroux was a lawyer with the last name, Liptiz. The Local 264 business agent who was to represent my best interests also has the last name, Liptiz.

64. In approximately 2001, Local 264 of the Teamsters organized Shuttle America pilots. These pilots who were organized by Local 264 and who were members of Local 264 included approximately 25 Shuttle America pilots who either lived in Massachusetts or worked out of Hanscom Field in Bedford, Massachusetts, or both. At least one of these pilots, Brian O'Donnell who lives in Barnstable, Massachusetts, is still a member of Local 264.

65. Until some time in 2001 or 2002, Local 264 of the Teamsters had approximately 25 members who were Shuttle America pilots who either lived in Massachusetts or worked out of Hanscom Field in Bedford, Massachusetts, as I did.

66. I had started to pay an agency fee to Local 264 in approximately the Fall of 2001. I only paid that for a few months , as I was fired (my first firing) several months after I started paying the agency fee, and I did not pay the agency fee while I was out of work. Once I was ordered reinstated from my first firing, I paid monies to Local 264 to make up for the agency fees that I had not paid while I was fired, and started paying fees again. I even paid the agency fee for some time after I was fired for the second time in February, 2003. In relation to all those payments, I mailed checks drawn on Massachusetts banks to Local 264 in New York, from my home in Massachusetts, and Local 264 negotiated these checks.

67. I mailed agency fee checks on at least 10 occasions between Fall 2001and October 2003. The total of these agency fees I paid over that period, and which was accepted by Local 264, was at least $1418.50. I have appended to this affidavit copies of as many of the checks I sent to Local 264 as I could currently locate.

68. Subsequent to my termination in February, 2003, I wrote at least several dozen letters to Local 264regarding different aspects of their representation of me. All of these letters were mailed from Massachusetts to Local 264 at its address in New York.

05/15/2004  03:30     508-775-2877          D LYLE ELKINS                    PAGE  09/09

8

69. Subsequent to my termination in February, 2003, Local 264 officials wrote several letters to me regarding their representation of me. All of these letters were sent from New York to me at my home in Massachusetts.

70. Subsequent to my termination in February 2003, Local 264 officials placed approximately 6 phone calls to me regarding their representation of me, and I placed approximately 3 phone calls to them regarding their representation of me. I relation to these calls, I spoke on the phone with Local 264 officials approximately 3 times subsequent to my termination in February, 2003.

71. Subsequent to my termination in February, 2003, I sent at least several dozen facsimile to Local 264 regarding different aspects of their representation of me. All of these facsimiles were transmitted from Massachusetts to Local 264 at its address in New York.

72. Subsequent to my termination in February 2003, Catherine Creighton sent me one communication by mail to me regarding her representation of me, and she called me on the phone in Massachusetts one time regarding her representation of me.

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS 20TH DAY OF NOVEMBER, 2005.


D. Lyle Elkins